IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANTHONY K. WELLS-BEY #210-590,
    *Plaintiff*,

v.

NANCY K. KOPP, *et al.*,
    *Defendants*.

Civil Action No. ELH-12-2319

**MEMORANDUM OPINION**

Anthony K. Wells-Bey, the self-represented plaintiff, is a Maryland state prisoner incarcerated at North Branch Correctional Institution ("NBCI"). Alleging that he is denied meals that comport with his Muslim religion, plaintiff filed suit, pursuant to 42 U.S.C. § 1983, against defendants Nancy K. Kopp, the State Treasurer; Gary D. Maynard, the Secretary of the Maryland Department of Public Safety and Correctional Services ("DPSCS"); Roderick R. Sowers, the Director of Correction for the North Region of DPSCS;[1] and Scott S. Oakley, the Director of the Inmate Grievance Office, an independent unit within DPSCS. Another inmate, Ross Farewell, has filed a motion seeking permissive joinder as a plaintiff in Mr. Wells-Bey's suit ("Joinder Motion") (ECF 16).

Defendants filed a motion to dismiss or, in the alternative, for summary judgment ("Defense Motion") (ECF 14), supported by a legal memorandum (ECF 14-1) and several exhibits, including some of plaintiff's medical records. Mr. Wells-Bey filed a response (ECF 17) in opposition to the Defense Motion, and defendants filed a reply (ECF 18). Defendants also

---

[1] Mr. Sowers' surname is misspelled as "Sower" in plaintiff's Complaint and on the docket. The Clerk is directed to correct the spelling on the docket.

filed a response in opposition to Mr. Farewell's Joinder Motion (ECF 19).[2]   No hearing is

necessary to resolve the motions.   *See* Local Rule 105.6.   For the reasons stated below, the

Defense Motion will be granted in part and denied in part, and the Joinder Motion will be denied.

## Background

Maryland makes available to state prisoners an administrative process for the redress of a

prisoner's "grievance against an official or employee of the Division of Correction."   Md. Code

(2008 Repl. Vol., 2012 Supp.), § 10-206 of the Correctional Services Article ("C.S.").[3]

Regulations promulgated by DPSCS concerning the grievance process define a "grievance" to

include a "complaint of any individual in the custody of the [DOC] . . . against any officials or

employees of the [DOC] . . . arising from the circumstances of custody or confinement."

COMAR 12.07.01.01.B(8).   Maryland state appellate case law indicates that the administrative

grievance process applies to a wide variety of matters that "relate to or involve a prisoner's

'conditions of confinement.'"   *Massey v. Galley*, 392 Md. 634, 651, 898 A.2d 951, 960 (2006)

(citation omitted).

---

[2] Mr. Farewell has not filed a reply, and the time for him to do so has expired.   *See* Local Rule 105.2(a); Fed. R. Civ. P. 6(a)(1)(C), (d).

[3] The Division of Correction ("DOC") is the unit of DPSCS responsible for management of correctional institutions.   By statute, the Commissioner of Correction is in charge of the DOC. *See* C.S. §§ 3-201, 3-202, 3-203.   However, due to a recent internal reorganization of DPSCS, which divided responsibility for DPSCS operations into three geographic regions, the office of Commissioner is currently vacant.   J. Michael Stouffer, the former Commissioner, was appointed Deputy Secretary of Operations, overseeing three executive directors for operations, each responsible for consolidated DPSCS operations in one geographic region.   *See* Dan Dearth, *Maryland Prison Reorganization Designed to Better Help Inmates Transition Into Society*, HERALD-MAIL, Nov. 30, 2011, *available at* http://articles.herald-mail.com/2011-11-30/news/30457042_1_maximum-security-prison-gary-d-maynard-state-prison (last visited April 15, 2013); Md. State Archives, MD. MANUAL ON-LINE, "Department of Public Safety & Correctional Services," *available at* http://msa.maryland.gov/msa/mdmanual/22dpscs/html/ dpscs.html (last visited April 15, 2013); DPSCS, "DPSCS Reorganization," *available at* http://www.dpscs.state.md.us/publicinfo/reorg/index.shtml (last visited April 15, 2013).

Under the grievance process, an inmate must first file his grievance pursuant to any administrative remedy procedure ("ARP") that is maintained by the institution in which he is confined. *See* C.S. § 10-206(b); *see also* Code of Maryland Regulations ("COMAR") 12.07.01.02.D. The inmate may request review of an institutional denial of his grievance by submitting a complaint to the statewide Inmate Grievance Office ("IGO"). *See* COMAR 12.07.01.05.B; *see also* C.S. § 10-206. Complaints are reviewed preliminarily by the IGO. *See* C.S. § 10-207; COMAR 12.07.01.06. If the IGO determines that the complaint is not "wholly lacking in merit on its face," C.S. § 10-208(c), it refers the matter to the Maryland Office of Administrative Hearings ("OAH"), for a hearing to be conducted by an administrative law judge ("ALJ"). *See* C.S. § 10-208; COMAR 12.07.01.07-.08.

A decision of an ALJ that dismisses an inmate's grievance in its entirety is considered a final agency determination. See C.S. § 10-209(b)(1). On the other hand, an ALJ's decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of the Department of Public Safety and Correctional Services ("DPSCS"), who is entitled to adopt or reject the ALJ's recommendation, in whole or in part. *See* C.S. § 10-209(b)(2), (c). In any event, an inmate may seek further judicial review, in Maryland state courts, of an unfavorable final agency decision. *See* C.S. § 10-210.

Mr. Wells-Bey's suit has its genesis in a grievance filed by another DOC inmate, Alonzo Turner-Bey, who is also Muslim and who was, at all relevant times, not incarcerated at the same DOC institution as Mr. Wells-Bey. In 2009, after exhausting the ARP process pertinent to his own institution, Mr. Turner-Bey filed a complaint with the IGO, claiming that he was "'improperly denied access to a "Halal" religious diet for Muslim inmates similar or equal to the

"Kosher" religious diet provided to Jewish inmates.'" ECF 1-1 at 5 (quoting Turner-Bey IGO complaint). Mr. Turner-Bey's complaint was referred to the OAH, and ALJ D. Harrison Pratt held an evidentiary hearing on the matter. On January 15, 2010, ALJ Pratt issued a written Proposed Decision and Order concluding "as a matter of law that the DOC acted arbitrarily and capriciously, and in a manner inconsistent with the law, when it denied [Mr. Turner-Bey] Halal meals." ECF 1-1 at 14. Accordingly, ALJ Pratt recommended to the Secretary of DPSCS that "the DOC be required to provide [Mr. Turner-Bey] with Halal meals." *Id.* In January 2011, Secretary Maynard issued an Order affirming ALJ Pratt's Proposed Decision and Order. ECF 1-1 at 17.

In March 2011, Mr. Wells-Bey he filed an ARP request with Bobby Shearin, the Warden of NBCI, in which he noted that Secretary Maynard had issued a ruling in January 2011 that required the provision of Halal meals for Muslim inmates, and asked that he be provided with Halal meals. *See* ECF 1-1 at 1. The record does not contain Warden Shearin's ruling as to the ARP request, but it apparently was not favorable to Mr. Wells-Bey, because Mr. Wells-Bey filed a complaint regarding his grievance with the IGO on June 16, 2011. *See* ECF 1-1 at 4. After preliminary review, the IGO referred Mr. Wells-Bey's grievance to the OAH. ALJ Jennifer M. Carter Jones held an evidentiary hearing as to Mr. Wells-Bey's grievance on December 15, 2011, and issued a Proposed Decision and Order on March 19, 2012.

In her Proposed Decision and Order, ALJ Jones made several factual findings, including the following, ECF 1-1 at 22:

- That Mr. Wells-Bey, as a practicing Muslim, is religiously obligated to adhere to a Halal diet;

- That, under a Halal diet, Mr. Wells-Bey could only eat meat that has been ritually slaughtered according to the dictates of Islam, but that he could eat vegetarian meals so long as they do not contain products considered harmful under Islam, including pork oils, or fats from animals not slaughtered according to Halal practices;

- That the DOC provides a "Lacto-Ovo meal" and a vegetarian meal to Muslim inmates, but that these meal options do not include meat; and

- That Mr. Wells-Bey is allergic to eggs.

In the proceedings before ALJ Jones, the DOC acknowledged ALJ Pratt's earlier decision regarding Mr. Turner-Bey's similar grievance, but asserted "that Secretary Maynard ultimately reversed his decision to affirm ALJ Pratt's decision and the matter is now on appeal in the Federal District Court."[4]   ECF 1-1 at 24.   Moreover, the DOC claimed that, "in the two years since ALJ Pratt's decision, it has confirmed with Muslim spiritual leaders that the lacto-ovo vegetarian meals provided by the DOC comply with the Halal diet."  *Id.* at 24-25.   In support of this claim, the DOC submitted a letter from the Halal Certification Department of the Islamic Society of the Washington Area ("ISWA"), as well as numerous declarations of Imams who serve as Muslim chaplains for the DOC, all opining that the DOC's lacto-ovo vegetarian diet is compatible with the standards of Islam.  *Id.* at 25.

In her Proposed Decision and Order, ALJ Jones rejected the DOC's position.  She stated, *id.* at 27:

> Although the letters from the ISWA and declarations from DOC Imams each state that the DOC lacto-ovo vegetarian meals are acceptable to those of the Muslim faith, the DOC offered no reason why it should not make complete meals, including meat, available to Muslim populations as it does for other religious populations, including inmates who require kosher meals.  Restricting the foods available to Muslim inmates amounts to disproportionate treatment of Muslim inmates as a result of their religious beliefs.  In so finding, I note that this is not comparable to the situation in which an inmate voluntarily restricts his diet for

---

[4] Indeed, Mr. Turner-Bey filed suit in this district, in a case captioned *Turner-Bey v. Maynard*, Civ. No. JFM-10-2816 (D. Md.).  I discuss the *Turner-Bey* case in more detail, *infra*.

personal reasons, including vegetarianism.  Certainly, if the Grievant was a vegetarian, he might have less standing to challenge the DOC's failure to provide Halal meals.  But the Grievant is not a vegetarian, and the DOC has offered no penological interest or allegation of negative impact to support the conclusion that the Grievant, as a meat-eating Muslim should be treated any differently than any other meat-eating inmate with valid religious restrictions.

Accordingly, ALJ Jones concluded "as a matter of law that the DOC acted arbitrarily and capriciously, and in a manner inconsistent with the law, when it denied [Mr. Wells-Bey] Halal meals." *Id.* at 28.  The ALJ recommended that Mr. Wells-Bey's "grievance be granted and that the DOC be required to provide [Mr. Wells-Bey] with Halal meals." *Id.*  On April 2, 2012, Secretary Maynard issued an Order in which he affirmed ALJ Jones's Proposed Decision and Order.  ECF 1-1 at 19.

On April 12, 2012, Mr. Wells-Bey wrote three requests to Warden Shearin, NBCI Chaplain Kenneth Lamp, and the NBCI food service, requesting to be placed on a Muslim Halal meal in accordance with Secretary Maynard's Order.  *See* Complaint at 4; ECF 1-1 at 30-32.  Mr. Wells-Bey states that, in response to his request, Warden Shearin claimed he was investigating the matter, and the Chaplain informed Wells-Bey that there was no Halal meal plan.  Complaint at 4.  Mr. Wells-Bey further alleges that on April 17, 2012, he suffered "a full body allergic breakout after eating portions of a meal that was in close proximity to an egg by-product."  ECF 1-1 at 38.

Plaintiff wrote to Secretary Maynard on June 12, 2012, requesting that he compel staff at NBCI to comply with ALJ Jones's ruling, as approved by the Secretary's Order.  Complaint at 4.  Mr. Wells-Bey claims that, on July 13, 2012, a correctional officer at NBCI presented him with a "memo" from Warden Shearin denying that Wells-Bey was allergic to eggs, on the basis of an allergy test that had been previously performed.  Complaint at 4-5.  Moreover, Warden Shearin

allegedly asserted in the memo that the lacto-ovo vegetarian meal constituted a Halal meal and Wells-Bey would be placed on the lacto-ovo meal plan immediately. *Id.* Mr. Wells-Bey further claims that the correctional officer who presented him with the Warden's memo insisted that Wells-Bey sign the memo after reading it in order to verify that he had been informed of its contents. *See* ECF 1-1 at 37 & 40.[5]

Mr. Wells-Bey was placed on the lacto-ovo vegetarian diet as of the dinner meal on July 16, 2012. Because he believed this action was contrary to Secretary Maynard's Order, Mr. Wells-Bey filed another ARP complaint with Warden Shearin the next day, asserting that the Warden's decision to place him on the lacto-ovo diet "places [his] health and welfare in danger by forcing [him] to be placed on an egg based diet." ECF 1-1 at 38. Mr. Wells-Bey contended that DOC was "persist[ing] in trying to force [him] into becoming a Vegetarian against [his] will and at the expense of [his] health and well being." *Id.*

Plaintiff has submitted a letter from Jon P. Galley, the Executive Director of Regional Operations for the North Region of DPSCS.[6] *See* ECF 1-1 at 39. Mr. Wells-Bey claims that he received Mr. Galley's letter on July 23, 2012, but notes that it is dated July 13, 2012, the same day that he received Warden Shearin's memo. *See* ECF 1-1 at 40. In the letter, Mr. Galley indicated that he was responding to Mr. Wells-Bey's letter of June 12, 2012, to Secretary Maynard. ECF 1-1 at 39. Further, Mr. Galley stated: "After review of your IGO Case . . . and contact with the Administration at [NBCI], it has been found that you have agreed and signed a memo that the Lacto-Ova [sic] Diet would be provided to you by the Food Service Department at

---

[5] A copy of the memo from Warden Shearin is not contained in the record.

[6] Although the letter is from Mr. Galley, it was signed on Galley's behalf by his subordinate, Mr. Sowers, the Director of Correction for the North Region. *See* ECF 1-1 at 39.

the institution.  Your issue is now moot." *Id.*[7]

On July 25, 2012, Mr. Wells-Bey wrote to Secretary Maynard, again asking him to enforce his Order affirming ALJ Jones's decision.  *See* ECF 1-1 at 40-41.  With respect to Mr. Galley's assertion that he had agreed to be placed on the lacto-ovo diet, Mr. Wells-Bey queried: "Why would I sign an agreement to accept the very things I complained about for over a year, and finally accomplished through the A.L.J. proposed order 3/9/12 and your affirmation order 4/2/12 in my favor[?]"  *Id.* at 41.  Mr. Wells-Bey reiterated his claims that he is "allergic to eggs," that he is "a meat-eating Moslem," and that "the Vegetarian meal N.B.C.I. offer[s] is an egg base[d] diet."  *Id.*  In sum, he asked Secretary Maynard to "reverse" Mr. Galley's decision and "have the Warden of N.B.C.I. . . . carry out [the Secretary's] original order."  *Id.*

On August 2, 2012, Mr. Wells-Bey initiated this suit.

As indicated, another state inmate, Mr. Farewell, has moved to intervene in this case as a plaintiff.  In his Joinder Motion, Mr. Farewell states that he is a Sunni Muslim who "wishes to receive Halal Meats during recognized 'special holy day' meals and, is currently on-going [sic] the ARP process against Warden Bobby P. Shearin et al."  Joinder Motion at 1.[8]  Farewell reports that his grievance proceeding was placed in "Abeyance" pending the outcome of Mr. Turner-Bey's suit in this court, *Turner-Bey v. Maynard, et al.*, Civil Action JFM-10-2816 (D.

---

[7] A copy of the "memo" to which Mr. Galley referred is not included in the record, but plaintiff suggests it was the memo from Warden Shearin that he was instructed to sign as an acknowledgment.

[8] Mr. Farewell represents that he adheres to a different sect of Islam than does Mr. Wells-Bey.  According to Mr. Farewell, he is a Sunni Muslim, while Mr. Wells-Bey is a "Moorish Muslim."  In the *Turner-Bey* litigation, Judge Motz noted that Mr. Turner-Bey is an adherent of "the Moorish Science Temple of America, a uniquely American religious group identifying itself as part of Islam."  *Turner-Bey v. Maynard*, Civ. No. JFM-10-2816, 2011 WL 4327282, at *3 (D. Md. Sept. 18, 2012); *see also id.* at *1 n.1.

Md).   *See* Joinder Motion at 1-2.   However, Mr. Farewell alleges that this court may "grant [Farewell] exhaustion of state administrative remedies to permit joinder as a 'person bound' in civil class action."  *Id.* at 2.[9]

Additional facts are presented in the Discussion.

### Standards of Review

The Defense Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  Pursuant to Rule 12(d), however, a court has the discretion to consider matters outside of the pleadings in conjunction with a Rule 12(b)(6) motion.  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed.

---

[9] As I discuss below, 42 U.S.C. § 1997e(a), a provision of the Prison Litigation Reform Act of 1996, ordinarily requires a plaintiff who is imprisoned in a correctional institution to exhaust any available administrative remedies before commencing suit on a federal cause of action regarding prison conditions.

2004, 2012 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67. "When the extra-pleading material is comprehensive and will enable a rational determination of a summary judgment motion in accordance with the standard set forth in Rule 56, the district court is likely to accept it." *Id.* at 165. In contrast, when the extraneous material is "scanty, incomplete, or inconclusive, the district court probably will reject it." *Id.* at 165-66.

A court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). In this case, plaintiff was notified, pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), of his obligation to present evidentiary material in response to the Defense Motion. Moreover, the movants expressly captioned their motion "in the alternative" as one for summary judgment, and submitted matters outside the pleadings for the court's consideration. In that circumstance, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *see Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its

consideration of the motion the supporting extraneous materials."); *Fisher v. Md. Dept. of Pub. Safety & Corr. Servs.*, Civ. No. JFM-10-0206, 2010 WL 2732334, at *3, 2010 U.S. Dist. LEXIS 68772, at *8-10 (D. Md. July 8, 2010).

F. R. Civ. P. 56(a) permits a court to grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact. . . ."  And, the movant must demonstrate "a clear entitlement to judgment in its favor as a matter of law."  *King v. Gov't Employees Ins. Co.*, 843 F. Supp. 56, 56 (D. Md. 1994).  However, summary judgment is ordinarily inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours v. Kolan Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011).  But, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)). "Rather, to justify a denial of summary judgment

on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Mr. Wells-Bey has not filed an affidavit under Rule 56(d).  However, the matters as to which defendants submitted extrinsic evidence relate only to the issue of whether plaintiff is actually allergic to eggs.  With respect to that issue, as I will explain, summary judgment is premature, because the record does not establish that the material facts are undisputed.  Under Fed. R. Civ. P. 56(a), which governs motions for summary judgment, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Defendants' other arguments concern issues of law and matters as to which the Court may take judicial notice from its own records.  *See, e.g.*, *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n. 1 (4th Cir. 1990) ("[A] district court should properly take judicial notice of its own records").  Accordingly, I will exercise my discretion to consider defendants' other arguments under a Rule 12(b)(6) standard, without conversion to summary judgment.

A Rule 12(b)(6) motion constitutes an assertion by the defendant that, even if the facts alleged by the plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Thus, a Rule 12(b)(6) motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted).

"A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy he seeks. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 1960 (2012). "'Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'" *Hartmann v. Calif. Dept. of Corr. & Rehabilitation*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted); *accord Commonwealth Prop. Advocates, LLC v. Mortgage Electronic Registration Sys., Inc.*, 680 F.3d 1194, 1201-02 (10th Cir. 2011) ("When reviewing a 12(b)(6) dismissal, 'we must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.' Dismissal is appropriate if the law simply affords no relief.") (internal citation omitted).

As a self-represented litigant, plaintiff is entitled to a liberal construction of his pleadings. *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Dismissal "is inappropriate unless, accepting as true the well-pled facts in the complaint and viewing them in the light most favorable to the plaintiff, the plaintiff is unable to 'state a claim to relief.'" *Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011) (citation omitted).

## Discussion

### A. Religious Exercise and Establishment

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). Nevertheless, prison inmates retain a

right to reasonable opportunities for free exercise of religious beliefs, without concern for the possibility of punishment. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972). That retained right is not unfettered, however. Prison restrictions that impact on the free exercise of religion, but are related to legitimate penological objectives, do not run afoul of the Constitution. *See Turner v. Safely*, 482 U.S. 78, 89-91 (1987).

The test to determine if the restrictions are justified requires examination of whether there is a rational relation between the asserted governmental interest and the regulation in question. In addition, this court must examine whether there are alternative means of exercising the right asserted; whether accommodation of the right will impact on the orderly operations of the prison; and whether readily available alternatives to the regulation would be less restrictive.

An additional consideration in this case is the standard provided by the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), codified in 42 U.S.C. § 2000cc *et seq.* It provides, in pertinent part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person— (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a).

RLUIPA establishes a statutory protection for the free exercise of religion that exceeds the requirements of the Free Exercise Clause of the First Amendment. *See Madison v. Virginia*, 474 F.3d 118, 127 (4th Cir. 2006) (stating that RLUIPA "requires the States to provide prisoners with religious accommodations that are not compelled by the Constitution"). "'RLUIPA adopts a . . . strict scrutiny' standard." *Couch v. Jabe*, 679 F.3d 197, 203 (4th Cir. 2012) (quoting

*Lovelace v. Lee*, 472 F.3d 174, 198 n.8 (4th Cir. 2006)).  Under RLUIPA, the "plaintiff bears the burden of persuasion on whether the policy or practice substantially burdens his exercise of religion.  If the plaintiff satisfies this requirement, the government must then prove that the challenged policy is the least restrictive means of furthering a compelling governmental interest." *Couch*, 679 F.3d at 200 (internal citations omitted).[10]

Defendants contend that Wells-Bey's complaint is subject to dismissal because, in *Turner-Bey v. Maynard*, Civ. No. JFM-10-2816, 2011 WL 4327282 (D. Md. Sept. 18, 2012), Judge J. Frederick Motz determined that Muslim inmates in the custody of the DOC are not entitled, under either the First Amendment or RLUIPA, to a diet that includes ritually slaughtered meat.  In addition, defendants assert entitlement to summary judgment because they claim that Mr. Wells-Bey does not, in fact, have an allergy to eggs that inhibits his ability to eat a lacto-ovo based diet, as a substitute for meat.  *See* Defense Motion at 8-9.

In *Turner-Bey*, Judge Motz carefully considered the issue of whether the lacto-ovo diet provided by the DOC to Muslim inmates, in lieu of a Halal diet that includes ritually slaughtered meats, is an undue burden on the free exercise of religion by Muslim inmates.  To summarize briefly Judge Motz's thorough reasoning, Judge Motz concluded that DOC's failure to provide a Halal diet containing meat was not a substantial burden on Mr. Turner-Bey's exercise of religion, because Mr. Turner-Bey did not maintain (nor does Mr. Wells-Bey) that he is religiously obligated to eat Halal meat.  Rather, Islam prohibits eating meat that is *not* Halal.  Accordingly,

---

[10] RLUIPA was enacted pursuant to Congress's Spending Clause authority.  *See Cutter v. Wilkinson*, 544 U.S. 709, 715-16 (2005).  Accordingly, its protections are triggered by a state entity's acceptance of federal financial assistance, which is deemed to operate as a waiver of the state's Eleventh Amendment sovereign immunity against RLUIPA claims.  *See Madison*, 474 F.3d at 123-24.  Defendants have not disputed that the Maryland DPSCS is subject to RLUIPA.

Judge Motz reasoned, Muslim inmates are "not asked to choose between violating a religious precept or depriving [themselves] of adequate nutrition; an alternative meat-free diet is available that is acceptable under Islamic law." *Turner-Bey*, 2012 WL 4327282, at *8.

Moreover, Judge Motz determined that the DOC violated neither the Free Exercise Clause of the First Amendment nor the Equal Protection Clause of the Fourteenth Amendment by providing a kosher meal for Jewish prisoners while failing to provide an expressly designated Halal meal for Muslim prisoners. Judge Motz noted that a "kosher Jewish diet demands certain food preparation and food choices not required for Muslims who seek a halal diet," which rendered the DOC's ordinary ovo-lacto diet religiously unacceptable under the requirements of kosher dietary law. *Id.* at *10. Moreover, Judge Motz emphasized that the undisputed material facts before him showed that the kosher diet did not include meat; rather, both the kosher diet available to Jewish inmates and the ordinary ovo-lacto diet available to Muslim inmates "are centered around a [l]acto-ovo vegetarian diet." *Id*. Judge Motz said, *id.* at *8:

> [T]he denial of ritually slaughtered meat to both Jewish and Muslim prisoners is directly related to prison security (to prevent tension caused by the perception that different groups are treated differently), and is also related to cost, both with regard to the purchase of religiously slaughtered meat and to the cost of retrofitting food preparation and storage facilities and providing additional staff to keep such foods separate.

I find legally sound and persuasive Judge Motz's conclusion that DOC does not violate the Constitution or RLUIPA by providing the lacto-ovo diet to observant Muslim inmates rather than an expressly designated Halal diet containing Halal meat. Therefore, I expressly adopt his reasoning in *Turner-Bey* and incorporate it here by reference.[11] Accordingly, I conclude that

---

[11] Two decades ago, before the enactment of RLUIPA, Judge Frank A. Kaufman reached similar conclusions, solely on First Amendment grounds, in a class action brought by Muslim

plaintiff's allegation that the DOC violates his federal rights by failing to provide him a non-vegetarian Halal diet, standing alone, fails to state a claim upon which relief can be granted.  To that extent, plaintiff's claims will be dismissed.

## B.  Allergy

Mr. Wells-Bey presents an additional issue that did not arise in *Turner-Bey*.  Specifically, plaintiff contends that he has an egg allergy that makes the lacto-ovo diet inappropriate for him.

Defendants dispute that Mr. Wells-Bey is actually allergic to eggs.  In support of this factual claim, they have submitted a Declaration of Monica Metheny ("Metheny Decl."), Ex. B to Defense Motion (ECF 14-3).  Ms. Metheny is the Nurse Manager at NBCI.  She avers that she has reviewed Mr. Wells-Bey's medical records "to determine whether there was any indication that he is allergic to eggs."  Metheny Decl. ¶ 2.

Ms. Metheny has provided records as to three incidents that shed light on the question.  First, Ms. Metheny has provided records of a "lab draw" blood test conducted on July 16, 2009, in order to determine whether plaintiff was allergic to eggs.  *Id.* ¶ 3.  The records indicate that the test returned a "response of less than 2.0, which means that there was no detectable allergy to eggs."  *Id.*

Second, Ms. Metheny provided records of the incident on April 17, 2012, when plaintiff suffered an allergic reaction that he attributes to eating food contaminated by egg products.  *See id.* ¶ 4.  The medical records indicate that Mr. Wells-Bey presented to the NBCI health unit "for unscheduled sickcall re: egg allergy, and rash . . . starting this morning."  *See* ECF 14-3 at 7.

---

inmates in Maryland state custody.  *See Salaam v. Collins*, 830 F. Supp. 853, 859-61 (D. Md. 1993), *aff'd sub nom. Calhoun-El v. Robinson*, 70 F.3d 1261 (4th Cir. 1995) (table) (unreported).  Because plaintiff apparently has been in DOC custody since at least 1989, *see* ECF 17 at 11, he may have been a member of the plaintiff class in *Salaam*.

According to the record of the incident, Mr. Wells-Bey stated to medical personnel that "he was eating noodles that contained egg's [sic] and he is allergic to eggs." *Id.* However, the record also notes that the allergy test of July 15, 2009, indicated that Mr. Wells-Bey was not allergic to eggs. *Id.* The medical personnel observed that Mr. Wells-Bey was suffering from a "[r]ash [of] wheals, pruritic on the bilateral anterior [at] [m]ultiple sites and it is spreading." *Id.* Staff also noted that Mr. Wells-Bey stated that "the rash ha[d] gotten worse since [the] morning, and is spreading," and that it "burns, and itches all over his body," although he denied any "trouble swallowing, breathing, or SOB [shortness of breath]." *Id.* The medical staff diagnosed the condition as "Contact allergies due to exposure to Food," and prescribed prednisone and benadryl. *Id.* Ms. Metheny maintains that "there is no indication in the records apart from [plaintiff's] self-report that the Plaintiff has an allergy to eggs, and there is no other record documenting a complaint by the Plaintiff of a reaction to consuming eggs." Metheny Decl. ¶ 4.

Finally, Ms. Metheny states that an "inmate who is allergic to eggs cannot receive a flu vaccine," but states that, "on September 20, 2012 the Plaintiff received a flu shot." *Id.* ¶ 5. She avers: "As part of the procedure, inmates receiving flu shots are asked if they are allergic to eggs. If an inmate responds that he is allergic to eggs, the shot is not administered." *Id.* Moreover, she claims: "The record of the Plaintiff's flu shot bears the notation 'no egg allergy.'" *Id.*

Upon review of the medical record to which Ms. Metheny refers, however, the record is ambiguous. In fact, the record of Mr. Wells-Bey's health unit visit of September 20, 2012 states: "flu vaccine = no, egg allergy." ECF 14-3 at 10.[12]

---

[12] What a difference a comma makes. *Cf.* Lynne Truss, EATS, SHOOTS & LEAVES: THE ZERO TOLERANCE APPROACH TO PUNCTUATION, at 82 (Gotham Books 2003) ("The fun of

Mr. Wells-Bey asserts that the allergy tests that DPSCS conducted during the 2009–2011 period were not reliable.  In support of this claim, he has submitted a memorandum dated August 31, 2011, from Dr. Sharon L. Baucom, M.D., the Director of Clinical Services for DPSCS, directing DPSCS medical staff, "[e]ffective immediately, . . . to hold *indefinitely* . . . food allergy challenge testing."  ECF 17 at 12 (emphasis in original).[13]  Dr. Baucom stated, *id.* (emphasis in original):

> I have reviewed the allergy kit testing by Bio-reference which advises that, "*the test has not been cleared or approved by the FDA and should not be used for diagnosis without confirmation by other medically established means*."
>
> So for the allegations by inmates referencing allergies to tomatoes, beef, celery, fish etc., [if] there is no description of a life-threatening event or symptoms, please advise them to simply avoid the food noted.
>
> Documentation of a food allergy on the diet form and attaching the copy of the allergy test does not remove the risk management to you or the state.  Your documentation of a thorough allergy history, reactions, symptoms and treatment along with a request of a release of information to obtain past records related to admissions or assignment of medical alert bracelets, demonstrates an action on your part to pursue support of the inmate's history of a life threatening reaction to the food.  In these mature adults, if these foods have been severely problematic or recurrent, treatment records should exist.  Otherwise, the documentation noted along with instruction to the inmate to avoid these foods is a better deterrent to litigation and his safety.

In addition, Mr. Wells-Bey has submitted a copy of his DOC-issued photo identification card, which states on the back: "Medical Alerts: Asthma/Allergy: Egg-Noodles."  ECF 17 at 13-14.  According to plaintiff, his allergy has been listed on the back of his identification card since 1989.  ECF 17 at 11.  He states that his allergies have been "Life Long," and that he "had his last

---

commas is of course the semantic havoc they can create when either wrongly inserted ('What is this thing called, love?') or carelessly omitted ('He shot[,] himself[,] as a child.').").

[13] Defendants do not dispute the authenticity of Dr. Baucom's memorandum.

serious encounter in 1995-1996 at J.C.I. [Jessup Correctional Institution] in which I had to be treated." *Id.*[14]

The records presented by defendants to support their claim that plaintiff does not have an egg allergy are hardly comprehensive.  And, as the moving parties, defendants bear the burden to show that they are "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In light of plaintiff's contentions and his submissions, as well as the posture of the case and the liberal construction afforded to claims of a self-represented litigant, I conclude that the record does not support summary judgment in favor of defendants as to the issue of plaintiff's alleged allergy.

Accordingly, I will deny the Defense Motion to the extent that it is premised on defendants' claim that plaintiff is not allergic to eggs.  However, the motion will be denied without prejudice to defendants' right to renew or supplement their motion on the basis of a more complete record as to plaintiff's alleged allergy.[15]

### C.  Defendants Sowers and Oakley

Defendants also contend that plaintiff does not allege sufficient facts regarding actions taken by Mr. Oakley, the Executive Director of the IGO, or Mr. Sowers, the Director of Correction for the North Region, to state a plausible claim that they are individually liable to him.  Plaintiff presents no argument to the contrary, and I agree with defendants.  Accordingly, plaintiff's claims against Mr. Oakley and Mr. Sowers will be dismissed.

---

[14] Defendants have not produced any medical records related to the 1995-96 time period.

[15] In the event that dispositive documentary evidence as to this issue does not already exist, Rule 35 of the Federal Rules of Civil Procedure permits a court, upon motion and for good cause shown, to order a party to submit to a physical examination where the party's physical condition is in controversy.

### D.  Qualified Immunity

Defendants also insist that they are entitled to qualified immunity from liability as to plaintiff's claims, because it "was not clearly established that Muslim inmates had a Constitutional right to receive halal meals containing ritually slaughtered meat" at the time of plaintiff's requests.  Defense Motion at 10.

The doctrine of qualified immunity shields government officers from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In other words, it protects government officers from liability "'for reasonable mistakes as to the legality of their actions.'" *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Thus, "officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful" will be entitled to immunity from suit.  *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir.) (en banc), *cert. denied*, 132 S. Ct. 781 (2011); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

The qualified immunity analysis can be separated into two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right," *Saucier*, 533 U.S. at 201; and (2) whether the right at

issue "'was clearly established in the specific context of the case—that is, [whether] it was clear

to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the

situation he confronted.'"  *Merchant*, 677 F.3d at 662 (citation omitted).  Courts may "exercise

their sound discretion in deciding which of the two prongs of the qualified immunity analysis

should be addressed first in light of the circumstances in the particular case at hand."  *Pearson*,

555 U.S. at 236; *see also Merchant*, 677 F.3d at 661 (stating that the "two inquiries . . . may be

assessed in either sequence").

However, the doctrine of qualified immunity is limited in at least two ways that are of

import here.  First, "qualified immunity 'has no application to a suit for declaratory or injunctive

relief.'"  *S.C. State Bd. of Dentistry v. FTC*, 455 F.3d 436, 447 (4th Cir. 2006) (citation omitted).

Second, "[q]ualified immunity does not bar § 1983 actions brought against defendants in their

official capacity."  *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 335 n.11

(4th Cir. 2009).

In this case, the principal form of relief that plaintiff seeks is injunctive: he asks this

Court to order defendants to provide him a meal plan that includes Halal meat.  Qualified

immunity has no application to the availability of this remedy.

To be sure, plaintiff also seeks an award of $8,000 in damages.  *See* Complaint at 3.  This

remedial request may well be barred by qualified immunity.  However, in their briefing as to

qualified immunity, defendants have addressed only plaintiff's arguments with respect to his

asserted religious entitlement to meals that include Halal meat.  I have concluded that this claim

fails to state a claim upon which relief can be granted, rendering the issue of qualified immunity

moot.  Nevertheless, defendants have not addressed whether they are entitled to qualified

immunity with respect to plaintiff's surviving claim related to defendants' alleged obligation to accommodate his purported egg allergy, in combination with his religious dietary restrictions. Because the parties have not presented argument as to this issue, I will not rule on it. Defendants will be free to reassert their qualified immunity defense in a subsequent motion for summary judgment.

### E.  Joinder Motion

In response to Mr. Farewell's request to join this suit as a plaintiff, defendants interpose the affirmative defense of Mr. Farewell's failure to exhaust his administrative remedies. The requirement to exhaust administrative remedies derives from 42 U.S.C. § 1997e(a), a provision of the Prison Litigation Reform Act of 1996 ("PLRA"). The statute states: "No action shall be brought with respect to prison conditions under [42 U.S.C.] section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

Mr. Farewell's Joinder Motion expressly acknowledges that his administrative grievance proceeding concerning DOC's refusal to provide a Halal diet has been held in abeyance and has not been completed. On this basis, defendants argue that Mr. Farewell has failed to exhaust his administrative remedies. They state: "While the exhaustion of administrative remedies may be waived in cases that have been designated as class actions, where the concept of vicarious exhaustion comes into play, that is not the case here. Therefore, Mr. Farewell's admission that he has not exhausted administrative remedies disqualifies him from joining this suit as a plaintiff." ECF 19 at 1.

It is questionable whether a state correctional agency can place an inmate's grievance in "abeyance" and thereby keep the inmate in limbo, unable to exhaust his administrative remedies. *See Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) ("[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it."); *see also Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) ("Prison officials may not take unfair advantage of the exhaustion requirement, . . . and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting.").  Moreover, this Court recently applied the doctrine of vicarious exhaustion in a case that had not been certified as a class action. *See Jarboe v. Md. DPSCS*, Civ. No. ELH-12-572, 2013 WL 1010357, at *12-15 (D. Md. Mar. 13, 2013).  To be sure, *Jarboe* was filed as a class action; the question of class certification simply had not yet been resolved at the time the issue of PLRA exhaustion was litigated. However, in concluding that vicarious exhaustion applied, I was guided by cases that had applied the doctrine of vicarious exhaustion outside of the class action context.

In any event, I conclude that joinder of Mr. Farewell as a plaintiff is unwarranted on other grounds.  Permissive joinder is governed by Rule 20 of the Federal Rules of Civil Procedure.  In pertinent part, it provides:

> Persons may join in one action as plaintiffs if:
>
> (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all plaintiffs will arise in the action.

Fed. R. Civ. P. 20(a)(1).

Mr. Farewell does not assert that he has any health-related reason for his request for a dietary accommodation, analogous to Mr. Wells-Bey's alleged egg allergy.   Rather, Mr. Farewell's claims relate solely to religious accommodation and non-discrimination.   For the reasons stated above, Mr. Wells-Bey's assertions on those bases fail to state claims upon which relief can be granted.   Accordingly, with respect to the claims that remain viable in the litigation, Mr. Farewell does not assert the same entitlement to relief or the same questions of law or fact as Mr. Wells-Bey.   And, as to the religious accommodation and non-discrimination claims, Mr. Farewell's Joinder Motion is rendered moot by the dismissal of Mr. Wells-Bey's similar claims. Accordingly, the Joinder Motion will be denied.

An Order implementing my rulings follows.


Date:   April 16, 2013                    _____/s/_____
                                                         Ellen Lipton Hollander
                                                         United States District Judge